No. 16.—BENJAMIN O. KEATON, plaintiff in error, *vs.* ELIZABETH
M. M. GREENWOOD, defendant.

[1.] Courts of Equity have jurisdiction to compel trustees to account for the
trust funds in their hands, especially when the accounts are complicated,
and from the facts alleged in the bill, it affirmatively appears, a discovery
from the defendant is necessary to obtain a decree.

[2.] The Statute of Limitations does not begin to run against *express trusts,*
created by the act of the parties, or by the appointment of the law, so long
as the trust continues, and is acknowledged to be a *continuing, subsisting
trust,* for the reason, that the possession of the trustee is the possession of
the *cestui que trust;* but when the trust is denied by the trustee, and he
claims to hold the trust funds or the trust property, as his own, *adversely* to
his *cestui que trust,* the latter having *knowledge* of that fact, the Statute will
begin to run in favor of such express trustee from the time of such *adverse*
claim or possession.

[3.] The Statute of Limitations will begin to run against *implied* trusts—as,
where a party claims title to property in his *own right,* and is sought to be
converted into a trustee by the decree of a Court of Equity—the Statute
will begin to run in his favor, from the time of his possession, in the same
manner as it would do in a Court of Law; for the reason, that his posses-
sion never was the possession of the alleged *cestui que trust*—the relation of
trustee and *cestui que trust* never, *in fact,* exists between them, until the de-
cree of the Court establishing that relation.

In Equity, in Baker Superior Court.   Decision on demurrer,
by Judge WARREN, December Term, 1849.

Elizabeth M. M. Greenwood filed a bill, in Baker Superior
Court, against Benjamin O. Keaton, charging that, in 1835, her
affections became estranged from her husband, by reason of his
cruel treatment, and being far away from her kindred and friends,
with no one to guide her in the paths of virtue, she was ensnar-
ed by the assiduous kindness and attentions of Benjamin O. Kea-
ton, who at length succeeded in enlisting her affections; that be-
ing thus entangled, she soon lost her virtue, honor and chastity;
that a separation from her husband followed, and soon a divorce
was granted to him; that her husband then turned over to her, for
a permanent support, about $10,000; that having unlimited con-
fidence in Keaton, and being cut off from all connection with the
virtuous and respectable, and knowing Keaton to be a shrewd
and money-making man, she delivered to him the whole of her

property, in especial trust and confidence, directing and request-
ing him to use the money, as her agent, for her use and benefit, in
whatever way he deemed best and most conducive to her interest;
that he received it, promising to account to her, whenever re-
quested, for the principal and whatever profits he might make;
that Keaton immediately placed the fund into active and profita-
ble operation, by shaving notes at heavy discounts, purchasing
lands and negroes, which he re-sold at large profits, and finally
investing in land and negroes, which he worked to great advan-
tage; that by these and like means, the fund rapidly increased
until it amounted to the sum of $50,000; that the particular num-
bers of the land, the names and number of the negroes, the ob-
ligors of the notes, bonds and specialties, and the respective
amounts thereof, the said Benjamin O. has fraudulently and in
bad faith, withheld from complainant, and concealed, under his
own name, when he should have used the name of complainant,
as his *cestui que trust.*

The bill farther alleged, that in May, 1849, complainant de-
manded an account and settlement, which he refused, under vari-
ous pretences; among others, that he had paid complainant in
·lands—whereas, she alleged, that pending a suit filed by her for-
mer husband against Keaton, for *crim. con.* Keaton, pretending
to fear the issue of the suit, made a deed to complainant for a
number of lots of land in Baker and other Counties, the value of
which she did not know, or care to know, inasmuch as the deed
was made merely for her protection, should the said suit end dis-
astrously; that after the termination of the suit, which was favo-
rable, as Keaton found sale for the land, or whenever he wished,
he called for the deed, and erased therefrom, with the form of her
consent, such lots as he chose—complainant taking no thought
about it, as her confidence in him was unbroken, and his influ-
ence over her unlimited; that at one time he gave to her a negro
woman, worth about $600, as he said, for one of the lots of land;
what became of the proceeds of those erased from the deed, she
did not know or care, never conceiving that she had any title
therein; that he had thus erased all the lots, save *three,* and they
were valueless.

The bill farther alleged, that Keaton pretends he has a receipt
in full, whereas, the truth was, that sometime in November, 1844,
he told complainant, in the presence of witnesses, brought by

Keaton *vs.* Greenwood.

him, that he wanted to settle with complainant in relation to said lands. Unsupported by a friend, and withal having the same trusting confidence in him that had led her from the paths of virtue—being still his weak, though willing victim—she told him to settle; that Keaton then said, that he owed her only $180, and gave her a note for that amount on one Dennard; that he then presented her a paper to sign, which she did, not knowing its contents, but has since understood that it was an acknowledgment that he had fully accounted to her for the lands erased from the deed; that he made no account of his actings and doings, and that he procured this paper fraudulently, and in violation of the faith, trust and confidence reposed in him.

The bill farther alleged, that the negro woman, the note for $180, a house and lot in Albany worth $300, and the valueless land not erased from the deed, constitute all that complainant ever received from Benjamin O. Keaton, for the funds entrusted to his care; and that she never discovered the gross frauds practised by Keaton, in taking the receipt, or of his intention to refuse to account fairly with her, until shortly before the filing of her bill, and within that year, (1849.)

The prayer was for an account.

To this bill was filed a general demurrer for want of equity, and also a special demurrer, setting up as a defence the Statute of Limitations.

The Court overruled the demurrer, and Keaton, by his counsel, excepted.

H. MORGAN, for plaintiff in error, cited—

*R. Thomas vs. Brinsfield,* 7 *Ga. Rep.* 157, '8.   *Angell on Limitations,* 174, '5.   7 *Johns. Ch. R.* 110.   1 *Fonb. Eq.* 246 and note.   *Bouvier's Law Dic.* 605.   4 *Kent's Com.* 295.   *Sanders on Uses and Trusts,* 6.   *Cooper's Eq. Plead. Intro.* 27.   *Blac. Com.* 431.   *Fonb. Eq. Pl.* 246.   *Watts & Serg.* 95.   *Bou. Law Dic.* 605.   2 *Story's Eq.* 1195.   2 *Blac. Com.* 327 *to* 338.   3 *Blac.* 431.   *Cooper's Eq. Pl. Intro.* 27.   4 *Kent's Com.* 295.   2 *Fonb.* 333.   *Hill on Trustees,* 60.   *Addington vs. Conn,* 3 *Atk.* 151.   *Start vs. Mellish,* 2 *Atk.* 612.   2 *Story's Eq.* 970.   *Lewin on Trusts and Trustees,* 7, 8, 9 *and note.*   2 *Story's Eq.* 964.   *Cromys vs. Coleman,* 9 *Ves.* 323.   *Lewin on Trusts and Trustees,* 44.

*Hill on Trustees*, 65, '6. *Ib.* 66, '7. *Lewin on Trusts and Trustees*, 77, '8. 2 *Story's Eq.* 1195 *and note*. *Ib.* 1069, 1070 *and note*. *Ib.* 973. *Ib.* 1195. *Lewin on Trusts and Trustees*, 16. *Philips vs. Bryde*, 3 *Ves.* 120, 127. *Story on Agency, pp.* 2, 3, 4, 5, *and* §226. 1 *Story's Equity*, 464. 7 *Ga. R.* 207. *Ib.* 206. 1 *Story's Eq.* 71. *Acts of Legislature*, 1847, *p.* 197. *Story on Bail*, 2, 3, 101, '2, '4, §§141, '5 *to* 157, *and p.* 112. 2 *Story's Eq.* §1041. *Story's Eq. Plea.* 23, 242. *Mitford's Eq. Plea.* 37, 41. *Cooper's Eq. Pl.* 5. 2d *edit. of Wigram on Discovery*, 125 *to* 133. 4 *Johns. Ch. R.* 437. 1 *Story's Eq.* 187. *Coster vs. Murry*, 5 *Johns. Ch. Rep.* 522. *Troup vs. Smitt*, 20 *Johns. R.* 33. *Leonard vs. Pitney*, 5 *Wend. N. Y. Rep.* *Allen vs. Mille*, 17 *Ib.* 202. *Miles vs. Barry*, 1 *Hill*, *S. C.* 296 *or* 96. *Mass. Turnpike vs. Field*, 3 *Mass. R.* 201. *Horner vs. Fish*, 1 *Pick.* 135. *Wells vs. Fish*, 3 *Ib.* 74. *Farnam vs. Brook*, 9 *Pick.* 212. *South Sea Company vs. Mymondsile*, 3 *P. Wms.* 143. *Hanley vs. Cramer*, 4 *Cowen's N. Y. R.* 718, (*in Equity.*) *Angell on Limitations*, 188, 196, '7, '8, '9 *to* 202. *Kane vs. Bloodgood*, 7 *Johns. Ch.* 90, 114. *Trip, Slade and others vs. Low, administrator et al.* 2 *Kelly*, 304. 3 *Blac.* 431. 1 *Story's Eq.* 191, 199, 202, 207 *and note to* 238. *Prescott & Eason vs. Hublel, Timmons et al.* 1 *Hill*, *S. C.* 270. *Hilton vs. Banon*, 1 *Ves, Jr.* 284. *Ryan vs. Mackmath*, 3 *Brown's Ch. R.* 15, 16. *Mr. Belt's note and Pierce vs. Nibb, there cited p.* 16, *note*. *Jarvis vs. White*, 7 *Ves.* 413, '14. *Gray vs. Mathias*, 5 *Ves.* 293, '94. *Bromly vs. Holland*, 5 *Ves.* 618, '19. *Piersoll vs. Elliott*, 6 *Peters' R.* 95, 98. 1 *Johns. Ch. R.* 517. 1 *Story's Eq.* 309, 307, 308. *Adams vs. Barrett*, 5 *Ga. R.* 413. *Howell, administrator, vs. Fountain et al.* 3 *Kelly*, 176. *Whitehead vs. Peck*, 1 *Kelly*, 153. 3 *Black.* 432, 163. *Lever vs. Lever*, 1 *Hill's Ch. R. S. C.* 62. *Kane vs. Bloodgood*, 7 *Johns. Ch. Rep.* 110. 2 *Story's Eq.* 1284, 1520, 1521, *and notes*. *Madd. Ch. Pr.* 98. *Story's Eq. Plea.* 751 *to* 760. *Stackhouse vs. Barnston*, 10 *Ves.* 466, '67. 15 *Ib. ex parte Dewdney*, 496. *Beckford vs. Wade*, 17 *Ib.* 96. *Murry vs. Coster*, 20 *N. Y. Rep.* 576, 582, *and* 5 *Johns. Ch. R.* 522. *Prevost vs. Arats*, 6 *Wheat.* 489. *Elmondorf vs. Taylor*, 10 *Ib.* 168. *Nelson vs. Wilkins*, 3 *Peters*, 44, 52. *Pactt vs. Vattier*, 9 *Ib.* 405, 416, 417. *South Sea Company vs. Mymondsile*, 3 *P. Wms.* 143. *Doloraine vs. Browne*, 3 *Bro. C. R.* 633, 646. *Mr. Belt's Note*. *Delouche vs. Lanties*, 3 *Johns. Ch. Reps.* *Angell on Limitations*, 161, 174. *Farnam vs. Brooks*, 9 *Pick.*

Keaton *vs.* Greenwood.

212.  *Kane vs. Bloodgood*, 7 *Johns. Ch. R.   Sims vs. McDon-ald*, 3 *Kelly.   Thomas vs. Brinsfield*, 7 *Ga. Rep.* 157, '58.   *Lever vs. Lever*, 1 *Hill's Ch. R. S. C.* 62.   *Barnwell vs. Barnwell*, 2 *Ib.* 252.   *Fonb. b.* 1, *chap.* 4, §27, *and note p.* 287.   *Purcell vs. Mc-Namara*, 14 *Ves.* 91.   8 *Porter's Ala. Rep.   Houseal vs. Gibbs*, 1 *Bail. Eq. S. C. R.* 482.   *Wardlaw vs. Gray, Dudley's Ga. Rep.* 85.   *Taylor vs. Bates*, 6 *Cow. N. Y.* 376.   *Strafford vs. Richard-son*, 15 *Wend.   Ferris vs. Parris*, 10 *Johns.* 288.

LYON, for defendant, cited—

1 *Bailey's Rep.* 230.   2 *Atk.* 612.   *Cooper's Eq. Pl.* 11.   2 *Story's Eq. Jur. note to* §495.   *Jeremy's Eq.* 184, 390.   *Lady Ormond vs. Hutchinson*, 13 *Ves.* 47.   *Purcell vs. McNamara*, 14 *Ves.* 91.   *Wood vs. Downs*, 18 *Ves.* 120.   *Hovenden vs. Annesly*, 2 *Sch. & Lef.* 634.   *Freeman's Ch. Rep.* 156, 300.   *Murray vs. Mason*, 8 *Porter's Rep.* 222.   1 *Hill's S. C. Rep.* 67.

*By the Court.*—WARNER, J. delivering the opinion.

Two questions were made on the argument of this cause, by the plaintiff in error—

First—whether the allegations in the complainant's bill are sufficient to give to a Court of Equity jurisdiction of the cause ?

Second—whether the complainant's right to call the defend-ant to account with her, concerning the money and property placed in his hands, and entrusted to his management, for her ben-efit, is not, according to the allegations made in her bill, barred by the Statute of Limitations?

[1.] In regard to the first objection, we are of the opinion the complainant has made, upon the record, a clear case for the ju-risdiction of a Court of Equity.   The bill charges, that the com-plainant placed a large amount of money and other property in the hands of the defendant, in the trust and confidence that he would so use it, and invest it for her benefit, as, in his discretion, should be most conducive to her interest; that he accepted the money and property, so placed in his hands and entrusted to him for the purposes stated, and has made large profits therefrom, by investing the money so placed in his hands, by the complainant, as well as the money arising from the proceeds of the property

so turned over to him, in lands, negroes, negotiable securities and other property; that the particular numbers of the land, so purchased by defendant with the funds of the complainant, as well as the names and number of the negroes, the names of the obligors of the notes, bonds and specialties, and the respective amounts thereof, the defendant has *fraudulently* and in bad faith, withheld from the complainant, and *concealed* the same under his own name.

The plaintiff in error insists, that it is not alleged in the bill, that it is necessary to search the conscience of the defendant for a *discovery*, to enable her to obtain a decree against him.   The reply is, that the complainant has made such allegations as make it affirmatively appear, on the face of the bill, that such a discovery *is necessary.*   The allegation of such facts, as make it appear that a discovery from the defendant *is necessary* to enable her to obtain a decree, will give to the Court jurisdiction, and is equally as satisfactory as if the allegation, that it *was necessary,* had been inserted without the facts.   The very nature and history of this transaction, as disclosed by the record, necessarily gives to a Court of Equity jurisdiction.   It has been earnestly insisted before us, that the claim of the complainant is, by her own showing, barred by the Statute of Limitations, and that, if in the view of the Court, the defendant shall be considered as a *trustee* for the complainant, still it is such a trust as against which the Statute of Limitations will run.

There are two general classes of trusts—First, *express* trusts, created by the act of the parties, or by the appointment of the law.   Under this head may be included executors and administrators, guardians of infants, bailees, factors, agents, persons who receive money to be paid to another, or to be applied to a particular purpose, and those who fill any *fiduciary* situation, created either by the act of the parties, or by the appointment of the law. Every deposit, says Chancellor *Kent,* in *Kane vs. Bloodgood,* (7 *Johns. Ch. R.* 110,) is a *direct* trust.

Second, *implied* trusts, as where persons claiming property in their *own right,* are, by the decree of a Court of Equity, founded on *fraud* or the like, held to be trustees by implication of law.

Many cases have been cited at the bar in relation to the application of the Statute of Limitations to trusts and trustees.   Without attempting to reconcile and harmonize the apparent conflict-

ing decisions to be found in the books, both in England and in this country, upon this question, we will endeavor to deduce from them the following general propositions:

[2.] First, that in cases of *express* trusts, created either by the act of the parties, or by the appointment of the law, the Statute of Limitations does not begin to run in favor of the trustee, so long as the trust continues, and is acknowledged to be a *continuing, subsisting trust*, for the reason, that the possession of the *trustee* is the possession of the *cestui que trust;* but when the trust is *denied* by the trustee, and he claims to hold the trust funds or the trust property as his own, *adversely* to his *cestui que trust*, the latter having *knowledge* of that fact, the Statute will begin to run in favor of such express trustee, from the time of such *adverse* claim or possession. *Kane vs. Bloodgood*, 7 *Johns. Ch. R.* 123. *Boone vs. Chiles*, 10 *Peters' Rep.* 223. *Willison vs. Watkins*, 3 *Peters*, 52. *Houseal vs. Gibbs*, 1 *Bailey's Eq. R.* 485. *Baker vs. Whiting*, 3 *Sumner's Circuit Court Rep.* 466.

[3.] Second, in cases of *implied* trusts, where the party claims title to the property in his *own right*, and is sought to be converted into a trustee by operation of law, the statute begins to run in his favor from the time of his *possession*, in the same manner as it would do in a Court of Law, for the reason, that *his* possession never was the possession of the alleged *cestui que trust*, inasmuch as the relation of trustee and *cestui que trust* never, in *fact*, exists between them, until the decree of the Court, establishing that relation; until that time, the alleged trustee held, and claimed, in his *own right*. *Boone vs. Chiles*, before cited, 223. *Edwards vs. University*, 1 *Dev. & Batt. Eq. Rep.* 326, '7. When the cases to be found in the books, assert the principle that the Statute of Limitations does not run against an *express trust*, it must be understood, that the Statute does not run, so long as the trust continues, as an *acknowledged subsisting trust;* but it must also be understood with the qualification, that if the trustee *disavows* the trust, and claims the trust funds, or the trust property, in his *own right*, *adversely* to his *cestui que trust*, with the *knowledge* of the latter, the Statute will begin to run from the time of such *adverse* claim and possession; otherwise, the Statute of Limitations would fail to accomplish one great object of its enactment.

Then let us apply the facts of the case before us, to the fore-

going principles, which we have asserted for its control and government.

The complainant deposited in the hands of the defendant a large amount of money and property, to be used, managed and invested for her benefit, in the *trust* and *confidence* that he would so use, manage, and invest it, as would be most conducive to her interest, and that he would account to her for the same, and the profits arising therefrom, whenever requested by her to do so. The defendant accepted the trust, by receiving the money and property, for the purposes designated, and has made large profits from the same.   Independent of the alleged settlement, which we shall hereafter notice, it appears that the trust continued as a *subsisting trust* in the hands of the defendant, from the time he accepted it, until the first of May, 1849, when her agent called on him for an account, which he refused, and denied that he had any of her property or effects in his hands. The Statute of Limitations, then, did not begin to run in favor of the defendant, according to the allegations made in the bill, until May, 1849, unless the alleged settlement stated therein constitutes a starting point for the operation of the Statute.   The plaintiff in error contends, that the Statute commenced running from the time of the alleged settlement.   Was that settlement made, or pretended to have been made, in relation to the *money* and *property* originally deposited in the hands of the defendant by the complainant, or was it made in relation to the *lands* mentioned in the deed executed to the complainant by the defendant, to avoid the effect of the anticipated recovery in the *crim. con.* suit against the defendant? After stating that the defendant had erased from the deed all the numbers of the lots of land of any value, the complainant alleges that the defendant, in the month of November, 1844, called on her, and said "he wanted to settle with her *in relation to said lands.*"   The complainant admits she signed a receipt prepared for her by the defendant, for the purpose of discharging himself from further liability, *on account of said lands, to her.*   What lands?   The lands mentioned in the deed executed by the defendant to the complainant, on the 12th day of September, 1839, for the purpose stated in her bill, and under which, she claims no interest in this suit.   That the settlement was had in relation to the lands mentioned in *that deed,* and which had been *erased* by the defendant, is the more apparent, by reference to the receipt

itself, which is attached as an exhibit, and found on the *back of that identical deed.* The receipt is in the following words :

" GEORGIA—BAKER COUNTY.

" This is to certify, that the within numbers in this deed, that is marked out, has been sold by B. O. Keaton for me, and the proceeds turned over to me by him, the said B. O. Keaton, this, the 2d day of November, 1844.

"E. M. M. GREENWOOD.

" Teste : JAMES JEFFRIES."·

From the allegations in the bill,· as well as from the receipt itself on the back of the deed, we are clearly of the opinion, that the alleged settlement had reference to the *lands* mentioned in that deed, and not to the *money* and *property* which had been turned over to the defendant, *in trust,* for the benefit of the complainant.

It is, however, insisted, that at the time of this alleged settlement, the defendant gave to the complainant a note on Dennard for $180 00, and said that was " *all he had in his hands of complainant's.*"

The argument is, that this was a *denial* of the defendant, that he owed the complainant any thing on account of the *trust* property in his hands ; that it was a *disavowal* of the trust on his part, and was *notice* to her that he was claiming the trust property as his own, *adverse* to her title, and therefore, the Statute commenced running in his favor,· against her, from that time.   The reply is, that the settlement was made in relation to the *lands* mentioned in the deed; and when the defendant said that the $180 00 was all he had in his hands of complainant's, he must be understood to have spoken in reference to the *subject matter* of the settlement—that the $180 00 was all he had in his hands belonging to the complainant, *on account of the lands which he had sold, and erased from the deed,* on the back of which, the receipt was entered, and not that the $180 00 was all that he had in his hands of complainant's, *on account of the trust property.*   If the settlement had been made in reference to the *trust* property, and the defendant had openly avowed that the $180 00 was *all* he had in his hands of *that property,* it might have been such a denial of the trust—such an *adverse* claim on his part to the *trust*

VOL. VIII. 14

*property*—as would have authorized the application of the Statute. For, then, the complainant would have been *notified* that he claimed, in his *own right*, the *trust funds* in his hands, as against her, and refused to account for them. The evidence, however, of such *adverse* claim, on the part of the trustee, ought, in all cases, to be clear and satisfactory, to authorize the running of the Statute of Limitation against an express trust. But it is sufficient for the present, to say, that in our judgment, according to the case made by the complainant, the alleged settlement had no reference to the *trust* property, but only to the *lands* erased from the deed ; and the declarations of the defendant at that time, must be considered as having had reference thereto.

　Let the judgment of the Court below be affirmed.